## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

DAVID DYKEHOUSE, KRISTINA BOSKOVICH, and ELIZABETH HAMBLIN, on behalf of themselves and all others similarly situated,  )
)
)
)
)   Case No.

     Plaintiff,  )
)

vs.  )   Hon.
)

THE 3M COMPANY, a Delaware Corporation, GEORGIA-PACIFIC LLC, a Delaware Corporation,  )
)   CLASS ACTION COMPLAINT
)
)   DEMAND FOR JURY TRIAL
)

     Defendants.  )

---

Plaintiffs David Dykehouse, Kristina Boskovich, and Elizabeth Hamblin, (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, file this Class Action Complaint and Jury Demand against Defendants The 3M Company ("3M") and Georgia-Pacific LLC ("Georgia-Pacific") (collectively, "Defendants"), and state as follows:

## I.  INTRODUCTION

1.  This action is a response to the tragic, avoidable poisoning of an entire municipal water system that services more than 3,000 people.

2.  The City of Parchment's water system, which also services portions of Cooper Township, was contaminated with dangerously high levels of harmful chemicals known as PFAS due to the Defendants' acts and failures to act. As a result, thousands of people have been placed at risk for developing serious and fatal diseases and a quiet Michigan town was thrust into the national news as the embodiment of fears shared by many Americans.

1

3.     Defendant Georgia-Pacific (including through entities merged into it) was responsible at various times for constructing, operating, maintaining, utilizing, and closing the Crown Vantage Landfill ("Landfill"), from which these dangerous chemicals were allowed to leach into the water system. It also dumped large quantities of waste into the landfill that contained the same chemicals. Despite full knowledge that the landfill contained substances that are harmful to human health, and that the landfill was situated extremely close to the wells from which Parchment's drinking water was drawn, Georgia-Pacific failed to construct, operate, maintain, use, and close the landfill in a safe and responsible manner.

4.     Defendant 3M manufactured these dangerous chemicals and has known about their dangers for decades. Internal studies from the late 1950s or early 1960s showed that PFAS accumulate in the human body and have toxic effects. Further research showed particular harmful effects, and yet more research was actively suppressed by 3M in order to hide the dangers of its products. 3M engaged in a campaign of disinformation and deceit in furtherance of its efforts to sell profitable products that it knew would cause widespread harm.

## II.     PARTIES

5.     Plaintiff David Dykehouse is an individual and Michigan citizen who at all times relevant hereto has resided at 302 Parchmount Avenue, Parchment, Michigan and intended to remain in Michigan.

6.     Plaintiff Kristina Boskovich is an individual and Michigan citizen who at all times relevant hereto resided at 1361 Remus St., Kalamazoo, Michigan and subseqently 31244 30th St., Paw Paw, Michigan, and intended to remain in Michigan.

7.      Plaintiff Elizabeth Hamblin is an individual and Michigan citizen who at all times relevant hereto has resided at 1085 East G Avenue, Parchment, Michigan and intended to remain in Michigan.

8.      Defendant The 3M Company is a Delaware Corporation with its principal place of business located in St. Paul, Minnesota.

9.      Defendant Georgia-Pacific LLC is a limited liability company organized in Delaware with its principal place of business located in Atlanta, Georgia.

## II.      JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. §1332(a) and/or §1332(d). Jurisdiction is proper because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, this is an action between citizens of different states whereby there is complete diversity of parties, and Plaintiffs and the members of the class are citizens of a different state than Defendants.

11.     Venue is proper in this Court under 28 U.S.C. 1391(b)(2),  because a substantial portion of the events or omissions giving rise to Plaintiffs' claims took place in this District, and because the property that is the subject of this action is situated in this District.

## IV.      GENERAL AND FACTUAL ALLEGATIONS

### The City of Parchment

12.     The City of Parchment, located in Kalamazoo County, Michigan, sits on the Kalamazoo River and has its roots as a factory town that took shape around a paper mill built in 1909.

13.     Unfortunately, aspects of the very mill that drove Parchment's development would also leave a toxic legacy for future generations.

14. The mill's operations have included a landfilling operation (the "Landfill") for disposing of paper-making waste. The Landfill served as a disposal location for waste generated by the mill and at least one other nearby papermaking facility.

15. Most of Parchment's residents are served by Parchment's municipal water system, while a smaller number receive their water from private wells.

16. Upon information and belief, Parchment's waster system services over 3100 users.

17. Many residents of neighboring Cooper Township are also served by Parchment's municipal water system.

18. Parchment's water system draws from three groundwater wells.

### 3M and PFAS

19. PFAS is a family of chemicals known as per- and polyfluoroalkyl substances which includes Perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), among other lesser-known substances.

20. PFAS chemicals are sometimes also referred to as PFCs.

21. 3M began to research and develop PFAS in the late 1940s, and began commercial production in the early 1950s.

22. PFOA is a derivative of a man-made chemical called Ammonium perfluoroctoanoate (APFO). APFO is not found in nature.

23. 3M was the original manufacturer of PFOA. It began producing PFOA by a process known as electrochemical fluorination in 1947.

24. 3M synthesized PFOA by electrochemical fluorination in Minnesota from 1947 to 2002, and during that time it was the world's largest producer.

4

25.     3M used PFOA to manufacture various products for applications including carpeting, upholstery, apparel, floor wax, textiles, sealants, and cookware.

26.     Importantly, PFOA was used in products applied to paper, such as waxed and food contact paper.

27.     PFOA (like PFOS) was considered desirable due to having the property of exceptional stability, which is precisely what causes it to be persistent in nature and cause environmental and health problems.

28.     3M began producing PFOS-based compounds by electrochemical fluorination in 1949, and announced the phaseout of PFOS and PFOS-related products in 2000.

29.     3M produced all or substantially all of the PFOS in the United States.

30.     3M produced a variety of widely-used products with PFOS, including the well-known Scotchgard and also Scotchban, which was used in the production of certain types of paper.

31.     3M's PFAS products were used at the Parchment Paper Mill and disposed of at the Crown Vantage Landfill.

32.     For decades, 3M took active steps to prevent the public from becoming aware of the dangers associated with PFAS.

33.     As it turns out, these dangers include that PFAS persist in the environment on a scale that can be measured in many human lifetimes and that they accumulate in the human body where they can cause horrific illnesses.

34.     3M created and manufactured these substances and has known about their dangers for decades.

35. 3M studies from the late 1950s or early 1960s showed that PFAS accumulate in the human body and are toxic.

36. 3M studies from the 1970s concluded that the chemicals were "even more toxic" than previously believed.

37. In the 1970s, 3M became aware that these chemicals were widely present in the blood of the general U.S. Population.

38. For decades, 3M failed to report legally-required information about the adverse health effects of PFAS to the EPA. As a result, it was eventually required to pay a $1.5 million dollar fine.

39. 3M began to test its workers' blood for organic fluorines at least as early as 1976, and at least as early as 1979 it identified PFAS in the blood of its employees at a plant in Alabama.

40. In 1978, 3M conducted tests that confirmed that PFAS had been found in its workers' blood.

41. In 1980, a 3M study confirmed that PFOS, also known as C8, is toxic to rats and monkeys.

42. In about 1983, 3M determined that organic fluorine levels in its workers' blood were increasing sharply. 3M's medical services team transmitted an internal document which noted that "[t]he test results that were reviewed at our meeting seem to substantiate a trend that has been developing over the past 12-18 months - a tendency for these levels in a number of people to no longer show the previous pattern of decline, in fact, a fair number are now demonstrating an increase in blood fluorine levels." The physician added that, unless the trends change, "we must view this present trend with serious concern. It is certainly possible that . . .

exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

43. A 1992 internal 3M study concluded that ten years of employment in PFOA production was associated with a three-fold increase in mortality from prostate cancer in men.

44. 3M has continued to make false and/or misleading statements regarding the safety of its products. For example, as late as May of 2000 it continued to publically insist that its PFAS products were safe.

45. 3M did not share the information it had discovered about the dangers and persistence of PFAS with authorities or the public until decades after it learned about them.

46. 3M concealed these and other key facts from government regulators and the scientific community, creating an internal team to "command the science" and erect "defensive barriers to litigation." It funded friendly research with numerous strings attached, and paid to suppress less favorable research, similar to the approach taken by the tobacco industry.

47. 3M also actively sought ways to make sure that whatever "science" was published regarding PFAS was favorable to its interests.

48. One professor, John Giesy, racked up a substantial net worth, at least in part by covertly suppressing independent scientific research on PFAS.

49. Professor Giesy received numerous grants from 3M for the selective funding of "outside research" that would assist the company in commanding the science and erecting defensive barriers to litigation.

50. Professor Giesy's work was clearly not all above board and had a substantial impact on the publically-available information regarding PFAS. In an e-mail to a 3M lab manager, he indicated that "[s]ince we had been set up as academic experts, about half of the

papers published in the area in any given year came to me (continue to come to me) for review. In time sheets, I always listed these reviews as literature searches so that there was no paper trail to 3M."

51.     Giesy bragged about rejecting at least one article that included negative information on the harmful effects of PFAS and related chemicals on human health.

52.     In another e-mail to a 3M employee, Mr. Giesy advised that "you want to keep 'bad' papers out of the literature, otherwise in litigation situations they can be a large obstacle to refute… I assume that you are keeping track of the literature in case we need it in the future."

53.     3M behaved as an entity that knew exactly how harmful its actions were. Beyond its efforts to stymie potential knowledge of the dangers of PFAS in the academic sphere, 3M destroyed documents, told staff to stamp all documents relating to PFAS as attorney-client privileged, throw away pencil notes from meetings and not to jot down thoughts because of how they could be viewed during legal discovery. One employee made a note to "clean out computer of all electronic data" on the chemicals.

54.     In about 1999, a 3M scientist resigned in protest, copying the EPA on a resignation letter which noted that he could "no longer participate" in a 3M process that put "markets, legal defensibility and image over environmental safety" while calling PFAS one of the most insidious chemicals in existence.

55.     During the time that it manufactured PFAS chemicals, 3M had extensive knowledge of the impact they had on the environment and human health.

56.     3M knew or should have known that PFAS, to the extent that they could ever be safely handled, must be handled in a way that safeguards against their migration into the environment.

57.     3M knew or should have known that it was likely that PFAS would be released from the sites where they were utilized and/or disposed of, and would reach groundwater, surface water, and soil, resulting in widespread contamination and significant injuries.

58.     3M knew or should have known that PFAS would pose dangers to humans in proximity to any area in which they were used and/or disposed.

59.     To the extent that 3M can assert any lack of knowledge regarding any particular danger of PFAS, that lack of knowledge can be directly attributed to 3M's significant efforts to suppress any scientific endeavor that might result in useful information about the harms of PFAS.

60.     3M posits its early 2000's exit from the manufacturing of PFAS as a magnanimous action that was taken voluntarily. In reality, it did so only under threat of long overdue action by the EPA once more information about the dangers of PFAS finally came to light.

61.     EPA and other regulatory bodies could have taken action sooner had Defendant not hidden, suppressed, and otherwise buried important information about the impacts of PFAS.

**The True Dangers of PFAS**

62.     While the evidence that PFAS are harmful to human health dates back several decades, their dangers have become more widely known in recent years as 3M has lost some of its capacity to "command the science" around them.

63.     The chemical properties of PFAS make them resistant to any breakdown or degradation in the environment, because they are thermally, chemically, and biologically stable. They are resistant to biodegradation, atmospheric oxidation by light, direct photolysis, and hydrolysis. They are therefore incredibly persistent when released into the environment.

9

64.     PFAS chemicals do not break down for hundreds, or potentially thousands of years.

65.     PFAS are known to bioaccumulate, or become physically concentrated, in humans and animals. A 2005 U.S. Department of Health and Human Services report confirmed that "human exposure to PFOS and PFOA lead to the buildup of these chemicals in the body."

66.     PFAS are particularly persistent in water and soil, and due to their water-solubility, they migrate readily from soil to groundwater.

67.     PFAS can travel through soil and other environmental media, which poses a significant risk of spreading pollution.

68.     The environmental persistence of PFAS makes it essential that locations known to be contaminated with PFAS be especially well controlled, to prevent long-term pollution of the natural environment and resources.

69.     PFOS was added to Annex B of the Stockholm Convention on Persistent Organic Pollutants in May of 2009.

70.     Exposure to PFAS chemicals is associated with a number of serious health risks.

71.     PFAS exposure is associated with an increased risk of chronic kidney disease, thyroid disease, high cholesterol, elevated liver enzymes, ulcerative colitis, pregnancy-induced hypertension, various auto-immune disorders, and numerous cancers including testicular, kidney, prostate, pancreatic, ovarian, and non-Hodgkin's lymphoma.

72.     Animal studies reveal the likelihood that PFAS have the ability to cause other cancers that have not yet expressly been associated with exposure in humans.

73.     The EPA has advised that PFAS exposure may result in developmental effects to fetuses or infants during breastfeeding.

74.     In 2005, an Environmental Working Group analysis of PFOA, conducted in accordance with the EPA's guidelines for assessing the cancer-causing potential of a chemical, found PFOA to be a likely carcinogen to humans. While this categorization requires only one of five EPA cancer criteria to be met, the analysis concluded that the chemical satisfied three of those criteria.

75.     In May of 2006, the EPA Science Advisory Board stated that PFAS cancer data are consistent with guidelines suggesting that the chemical is "likely to be carcinogenic to humans."

76.     An extensive study of the impacts of PFOA contamination, which included blood sampling from nearly 70,000 people in an impacted area, concluded that there was a "probable link" between PFOA exposure and testicular cancer, kidney cancer, thyroid disease, ulcerative colitis, high cholesterol, and pregnancy-induced hypertension.

77.     The health conditions associated with PFAS can arise months or years after exposure.

78.     In 2014, the EPA noted that "PFOA and PFOS are extremely persistent in the environment and resistant to typical environmental degradation processes. [They] are widely distributed across the higher trophic levels and are found in soil, air and groundwater at sites across the United States. The toxicity, mobility and bioaccumulation potential of PFOS and PFOA pose potential adverse effects for the environment and human health."

79.     In June of 2016, a peer-reviewed panel of scientists concurred with the U.S. Department of Health and Human Services National Toxicology Program's finding that PFOS and PFOA can harm the human immune system.

80.     In 2009, the EPA established provisional health advisories of PFOA at 0.4 ppb and PFOS at 0.2 ppb.

81.     In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule, requiring certain drinking water providers nationwide to test their water for these substances and report the results.

82.     In May of 2016, the EPA established Lifetime Health Advisories for both PFOS and PFOA at a combined concentration of .07 ppb (70 ppt).

83.     The sufficiency of the EPA's advisory is hotly disputed, with many experts of the opinion that they are too permissive.

84.     New Jersey set a maximum contaminant level of 14 ppt for PFOA in drinking water, and Vermot has set a level of 20 ppt for PFOA and PFOS in drinking water.

85.     Dr. Philippe Grandjean, Professor of Environmental Health at Harvard University's T.H. Chan School of Public Health, has conducted extensive research on PFAS chemicals and human health, and recommends a maximum concentration level of 1 ppt.

86.     In June of 2018, the U.S. Agency for Toxic Substances and Disease registry released a comprehensive 982 page Toxicological Profile for Perfluoroalkyls report, which shows that the safety thresholds should be 7 ppt for PFOS and 11 ppt for PFOA.

87.     The ATSDR report also suggests links between perfluoroalkyl exposure and health outcomes including hepatic effects, cardiovascular effects, endocrine effects, immune effects, reproductive effects, and developmental effects. It further examines the mechanisms for exposure-caused cancer.

88.     With each passing year, the more PFAS are studied the more bad news is uncovered. It is clear that 3M's efforts to actively conceal information about its products prevented the public from learning what it needed to know to avoid catastrophic results.

### The Paper Mill and Landfill

89.     Parchment's paper mill has changed ownership a number of times over its many decades of operations through a series of acquisitions. It was owned variously by the Kalamazoo Vegetable Parchment Co., Brown Co., James River Corp., Fort James Corp., and Crown Vantage Paper Co.

90.     The mill and its associated properties, including the Landfill, were owned by Fort James Corp. from approximately 1980 until 1995.

91.     The mill's operations have included the manufacture and subsequent disposal of products made with PFAS.

92.     3M-made PFAS were used at the mill and PFAS waste was buried at the mill's Landfill.

93.     For example, a perfluoroalykl polymer was a primary ingredient in an oil and grease repellant known as "Scotchban FX-845" which was produced by 3M and was used in laminated products produced at the plant.

94.     Scotchban was used in various consumer products that resist grease, water, and oil, including microwave popcorn packages.

95.     Crown Vantage Inc. (parent company) and Crown Paper Co. (subsidiary) (collectively, "Crown") were created from the James River Corporation as a spin-off in 1995 in an effort to reduce James River's debt. The spin-off included 11 of James River's mills, and the CEO of the new company had been an Executive Vice President for James River Corp.

96.     Part of the business that was spun-off into Crown was the specialty packaging and converting papers unit in Michigan, which included the Parchment plant and its Landfill.

97.     The Landfill actually consists of two separately permitted landfill units, referred to as the Type II Landfill and the Type III Landfill.

98.     A 1985 letter from James River Corporation to the Michigan Department of Natural Resources notes, regarding the Type II Landfill, that the "landfill is the exclusive property of James River and has therefore only received waste from the two James River Corp. facilities located in this area."

99.     The Type II landfill was closed and stopped accepting new waste by 1989.

100.    James River Corporation was issued Construction Permit #0202 on April 20, 1987 for a 32.8 acre solid waste disposal area at the Crown Vantage Landfill (the Type III Landfill), but the design was ultimately modified to a 21.2 acre disposal area. The landfill plans did not include any liner or leachate collection system.

101.    The Type III Landfill was established to provide disposal capacity for the James River Corporation Parchment Mill and the James River Corporation Kalamazoo Mill, located across the Kalamazoo River.

102.    Crown Paper Company operated the Type III Landfill from August 1995 through October of 2000 for the disposal of residual waste from papermaking operations.

103.    James River Paper was the prior owner and operator of the Type III Landfill and continued to dispose of solid waste in the landfill during the period of Crown Paper Company's ownership under the terms of a "Landfill Agreement" between Crown Paper Company, on the one hand, and James River Paper Company, Inc. and James River Corporation of Virginia (collectively, the "James River Entities"), on the other hand.

14

104.    Under the Landfill Agreement, Crown Paper Company allowed the James River Entities to continue to dispose of residual waste in the Type III Landfill in exchange for the payment of tipping fees and contribution to the costs associated with closure of the Type II and Type III Landfills.

105.    The James River Entities were required to pay tipping fees of two to four dollars per cubic yard, to start.

106.    During the timeframe of the agreement, the James River Entities disposed of papermill sludge at the Landfill. This includes waste from the James River Corporation Kalamazoo Mill, until November of 1997.

107.    A perfluoroalkyl polymer was a main ingredient in oil and grease-repellents used in laminated paper products produced by Fort James Corp in the 1990s. The repellant was patented by 3M and discontinued when 3M began phasing out products based on PFOS in 2000.

108.    Enormous volumes of waste containing high concentrations of PFAS were disposed of at the Type III Landfill by James River Corporation and/or James River Paper Company, Inc.

109.    The Landfill Agreement called for the closure costs of the Type III landfill to be borne 60% by the James River Entities and 40% by Crown Paper Company, for the first 50% of closure costs. Thereafter, the costs were to be divided according to the percentage of waste volume disposed by each party after the date of the agreement.

110.    The agreement called for closure costs for the Type II Landfill to be borne equally between the James River Entities and Crown Paper Company.

111.    The Landfill Agreement defined "Closure Costs" as "any requirements of the Michigan Department of Natural Resources to close the Landfill including but not limited to cap

15

placement, vegetation, post-closure maintenance, post-closure monitoring, and any require remedial actions or, in the case of the Type II Landfill, improvements to the existing cap, post-closure maintenance, post-closure monitoring, and any required remedial actions."

112.    Under the Landfill Agreement, the James River Entities were granted access to the Landfill and its files and records to "evaluate the Landfill's compliance with its permit and the requirements of the Michigan Department of Natural Resources."

113.    A 1997 lease agreement between Fort James Operating Company and Crown Paper Co. requires Fort James to retain liability for any remediation required due to its activities at the Parchment Mill's Premises.

114.    In 2000, only fifteen years into their existence, Crown Vantage, Inc. and Crown Paper Co. filed for bankruptcy and began liquidating their assets.

115.    The bankruptcy estates sought to abandon all rights, title, and interest in all of the real property associated with the Parchment Mill.

116.    Ultimately, Crown's' rights and interests under the Landfill Agreement with James River entities were assigned to MDEQ.

117.    In 1997, James River Corporation merged with Fort Howard Corporation and changed its name to Fort James Corporation.

118.    Also in 1997, James River Paper Company, Inc., which was a wholly-owned subsidiary of James River Corporation, changed its name to Fort James Operating Company.

119.    In 2000, Defendant Georgia-Pacific acquired the Fort James Corporation (formerly James River Corporation of Virginia), and the latter was merged into the former after Securities and Exchange Commission required divestitures were made.

120.    In April of 2002, Georgia-Pacific entered a Consent Order with the Michigan Department of Environmental Quality ("MDEQ"), setting forth Georgia-Pacific's responsibilities in closing the mill's landfill.

121.    The Consent Order notes that under the Bankruptcy Court Order and the Landfill Agreement, Georgia-Pacific had certain obligations with respect to the two landfill units.

122.    Under the Consent Order, Georgia-Pacific and MDEQ agreed "to set out their respective rights and obligations" with respect to the landfill units.

123.    The Consent Order required Georgia-Pacific to, among other things: (1) contribute to the cost of closure, maintenance, and long-term monitoring at the Landfills; and (2) generate and implement a plan for closing the Landfills (the "Closure Plan").

124.    The Consent Order expressly notes that it "in no way affects [Georgia-Pacific's] responsibility to comply with any other applicable state, federal, or local laws or regulations in the performance of its obligations" under the order.

125.    The order further notes that "the issues [sic] of resource damage has not been completely addressed by the execution of this Consent Order. It is agreed that the state of Michigan does not waive the right to bring an appropriate action to recover resources damages that are not remediated by the Closure Plan."

126.    In 2002, MDEQ found that Parchment's wellfield was "highly susceptible to potential contaminants."

127.    In February of 2003, the Consent Order was amended for purposes of extending the deadline for completion of the final certification information.

128.    MDEQ's April 15, 2002 contract with Georgia-Pacific to close the landfill notes that "[n]ot closing the landfill could result in contamination continuing to emanate into the Kalamazoo River."

129.    The contract further notes that "Georgia Pacific has developed the engineering plans and estimates for the costs of closures based on the ability to complete some of the work itself and to obtain sub contractors as needed."

130.    Prior to its closing, the Landfill had a history of regulatory and/or permit violations which were due, at least in part, to Georgia-Pacific's predecessors' negligent and/or faulty construction, operation, maintenance, and/or use of the landfill.

131.    For example, an August 3, 2001 MDEQ waste management division evaluation report noted that MDEQ "staff observed that the landfill had reached capacity and that excess fill above the limits established in the [construction permit] had been placed at the facility."

132.    MDEQ identified the level of fill as a permit and regulatory violation. At closure, the landfill was overfilled by approximately 60,000 cubic yards, or approximately 1.75 feet of uniform overfill over the entire 21.2 acre site.

133.    MDEQ also noted in the evaluation report that "stained soils were evident in many areas where stormwater that has come into contact with waste materials have flowed off the site."

134.    The evaluation report notes the permit obligation that "the facility shall not discharge pollutants into waters of the United States in violation of Part 31 or NPDES permit."

135.    Georgia-Pacific, directly and/or through the use of subcontractors, performed the work to close the Landfill.

136.    The Landfill was closed in a way that did not protect the groundwater from contamination by PFAS or other harmful substances in the Landfill.

137.    Prior to Georgia-Pacific's work in closing the Landfill, it was known that landfilling activities at the Type III Landfill were impacting the groundwater.

### Discovery of PFAS in Plaintiffs' Water Supply

138.    In recognition of the dangers and widespread impacts of PFAS, in 2017 Governor Snyder created the Michigan PFAS Action Response Team (MPART) as an interagency organization to "investigate sources and locations of PFAS contamination in the state, to take action to protect people's drinking water, and to keep the public informed as we learn more about this emerging contaminant."

139.    MPART has worked to identify areas where PFAS may be present as a contaminant. Without this effort, Parchment's residents would likely still be drinking PFAS contaminated water.

140.    On July 26, 2018, the Michigan Department of Environmental Quality ("MDEQ") discovered that Parchment's municipal water system and the wells from which it draws were contaminated with PFAS.

141.    Test results showed PFOS concentrations in Parchment's drinking water of 740 parts per trillion ("ppt") and PFOA concentrations of 670 ppt and a total PFAS concentration of 1587 ppt.

142.    Prior to the date of this discovery, neither Plaintiffs nor the class knew or should have known that their drinking water had been contaminated with PFAS.

143.    The State of Michigan has also adopted 70 ppt as the acceptable drinking water criterion for PFAS.

144.    This means that the concentration of PFAS detected in Parchment's municipal water well was more than 22 times the limits adopted by both the state and federal governments, which themselves are as much as 70 times the limits recommended by experts.

145.    On July 29, Lieutenant Governor Brian Calley declared a state of emergency in Kalamazoo County regarding the contamination of Parchment's water supply.

146.    Impacted residents were forced to drink bottled water until at least late August, 2018, after Parchment's system was connected to Kalamazoo's water service and the system was flushed. Many residents understandably still do not trust the water.

147.    On August 13, 2018, MDEQ received results for PFAS tests it conducted on 102 private wells in Parchment and Cooper Township. Results for those wells ranged as high as 340 ppt.

148.    MDEQ has reported that the highest PFAS levels were generally found closer to the Landfill.

149.    Indeed, MDEQ identified the Landfill as a "likely source" of the contamination.

150.    On July 31, 2018, MDEQ began to take samples from 14 groundwater monitoring wells at the Landfill.

151.    Samples collected from the landfill revealed one location contained 11,500 parts per trillion of or PFOA and PFOS.

152.    Part 201 of the Natural Resources and Environmental Protection Act governs the state's responses to contamination and provides for private parties to conduct certain response activities.

153.    Georgia-Pacific announced on October 1, 2018 that it would "voluntarily" aid efforts to identify the source of PFAS that contaminated the city's water.

154.    Georgia-Pacific has voluntarily agreed to do the following, at its own expense, under the MDEQ's supervision:

155.    Develop a work plan, with the MDEQ's assistance, that identifies monitoring well locations and depths, sampling procedures and analytical methodology;

156.    Install monitoring wells in accordance with the work plan;

157.    Measure water levels in the monitoring wells;

158.    Collect and analyze groundwater samples in accordance with the work plan;

159.    Provide all data to the MDEQ along with tables and figures to summarize results;

160.    Install additional monitoring wells and collect additional groundwater samples as needed to understand and define the extent of contamination as well as the sources of PFAS impacting private and public water supplies;

161.    Provide the MDEQ with a report on the information obtained through the work plan.

162.    While it likely lowers costs incurred by MDEQ, leaving Georgia-Pacific in charge of studying the cause of Parchment's water contamination raises obvious questions about bias in the results.

### Necessity of Medical Monitoring

163.    The hazardous substances to which Plaintiffs and the Class have been exposed are known to cause serious illness, as described herein and including without limitation various forms of cancer.

164.    Persons such as Plaintiffs and the Class who have been significantly exposed to the hazardous substances caused by Defendant's tortuous conduct have or will have a

significantly increased risk of contracting one or more diseases as described herein, including but not limited to cancer.

165.    The exposure to which Plaintiffs and the Class have been subjected make it reasonably necessary for them to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of their exposure.

166.    Monitoring procedures exist that make the early detection of the diseases and/or illnesses for which Plaintiffs and the Class are at an increased risk.

167.    Early diagnosis and treatment for the cancers, diseases, and disorders caused by PFAS exposure is essential to detect and mitigate long-term health consequences in Plaintiffs and the Class.

168.    Simple procedures including, but not limited to, blood tests, skin evaluations, scans, urine tests, and physical examinations are well-established and readily available.

169.    These measures are essential to preventing and/or mitigating long-term health consequences that will be borne by Plaintiffs and the Class Members through no fault of their own due to Defendants' actions in exposing Plaintiffs and the Class Members to dangerous chemicals and, in some cases, these measures are likely to prove life-saving.

170.    The requested tests, procedures, scans, and examinations are different from the normal recommended medical care, and will be specifically tailored to assess and monitor conditions that pertain to PFAS exposure, and they would not be necessary in the absence of a known exposure to these chemicals.

171.    Further, these tests, examinations, and procedures would occur more frequently than the normal recommended schedule of examinations for a population that had not been exposed to these levels of PFAS chemicals.

172.    The required testing is reasonably necessary and in accord with current medical and scientific procedures.

173.    Plaintiffs and the Class have no other adequate remedy at law, and medical monitoring through the establishment of a medical monitoring fund is reasonably necessary.

## VI.    CLASS ALLEGATIONS

174.    Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated pursuant to Fed. R. Civ. P.  23.

175.    Plaintiffs seek to represent a class preliminarily defined as "all persons who resided in homes serviced by Parchment, Michigan's municipal water system as of July 26, 2018 and  have not brought individual actions for personal injury or illness and do not opt out of the Class." Plaintiffs reserve the right to amend this class definition and/or add subclasses and/or issue classes (pursuant to Fed. R. Civ. P. 23(c)(4)-(5)) as discovery progresses and the appropriateness of any such classes is determined.

176.    Upon information and belief, there are approximately 3100 users of Parchment's water system.

177.    While the precise number of Class Members is not presently known, the Class is clearly so numerous that joinder of all members would be impracticable.

178.    169.    This case entails numerous questions of law and fact that are common to Plaintiffs and all members of the putative class. Such questions include, by way of illustration only and without limitation:

a.       The extent to which Parchment's water supply was contaminated with PFAS;

b.       The acts of the Defendants that caused Plaintiffs and the putative class to be exposed to PFAS contaminated drinking water;

23

c. How PFAS contamination migrated from the Landfill into the wellfields from which Parchment's water was drawn;

d. The harms and impacts imposed upon Plaintiffs and the class by their exposure to PFAS;

e. The acts of Defendant 3M in manufacturing and selling widely distributed, dangerous products about which it suppressed information and failed to warn;

f. The duty owed to the putative class by the each of the Defendants;

g. Whether each of the Defendants breached any duties owed to the putative class;

h. Whether the Defendants acted with a deliberate indifference to a known or obvious danger;

i. Whether the actions of the Defendants constituted gross negligence, because they were so reckless as to demonstrate a substantial lack of concern for whether an injury would result;

179. The claims of the named Plaintiffs are typical of the claims of the absent Class Members. The harms suffered by the named Plaintiffs are the same as those of the Class and they are pursued under the same legal theories as are applicable to the Class.

180. Plaintiffs will fairly and adequately protect the interests of the absent Class Members and have no conflicts with the Class with respect to the allegations in this complaint.

181. Plaintiffs have retained counsel with substantial experience related to the claims in this lawsuit. Plaintiffs' Counsel has represented certified classes in numerous cases involving environmental contamination (including from landfills), complex hydrological issues, and problems with municipal infrastructure.

24

182.     Plaintiffs' Counsel has investigated the allegations in this complaint, and has committed the appropriate resources to represent the Class.

183.     This case is appropriate for certification under Rule 23(b)(3). Common issues of fact and law predominate over questions affecting only individual Class Members and a class action is the superior means for litigating this case.

## Count I– PUBLIC NUISANCE

### All Plaintiffs and the Putative Class Against Both Defendants

184.     Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

185.     Defendants' actions in causing PFAS contaminated water to be delivered to the homes of Plaintiffs resulted in the presence of contaminants in Plaintiffs' properties and/or persons.

186.     Defendants' actions substantially and unreasonably interfered with Plaintiffs' comfortable living and ability to use and enjoy their homes, constituting a nuisance.

187.     Plaintiffs did not consent for PFAS contaminated water to physically invade their persons or property.

188.     Plaintiffs suffered injuries and damage to their persons and/or properties as a direct and proximate result of Defendants' actions in causing PFAS contaminated water to be delivered to their homes.

189.     The injuries to Plaintiffs and the Class are especially injurious to themselves as compared with the general public, which may have incurred injuries less substantial than those suffered by persons whose homes were serviced by the contaminated water system.

190.     Defendants' actions in causing a substantial and unreasonable interference with Plaintiffs' ability to use and enjoy their properties constitutes a nuisance and Defendants are liable for all damages arising from such nuisance, including compensatory and exemplary relief.

191.     Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

192.     As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered property damages, consequential damages, exemplary damages, and have been placed at a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

## Count II– PRIVATE NUISANCE

### All Plaintiffs and the Putative Class Against Both Defendants

193.     Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

194.     Defendants' actions in causing PFAS contaminated water to be delivered to the homes of Plaintiffs resulted in the presence of contaminants in Plaintiffs' properties and/or persons.

195.     Defendants' actions substantially and unreasonably interfered with Plaintiffs' comfortable living and ability to use and enjoy their homes, constituting a nuisance.

196.     Plaintiffs did not consent for PFAS contaminated water to physically invade their persons or property.

197.     Plaintiffs suffered injuries and damage as a direct and proximate result of Defendants' actions in causing PFAS contaminated water to be delivered to their homes.

198.   Defendants' actions in causing a substantial and unreasonable interference with Plaintiffs' ability to use and enjoy their properties constitutes a nuisance and Defendants are liable for all damages arising from such nuisance, including compensatory and exemplary relief.

199.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

200.   As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered property damages, consequential damages, exemplary damages, and have been placed at a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

### Count III -TRESPASS

**All Plaintiffs and the Putative Class Against Both Defendants**

201.   Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

202.   Defendants' negligent, grossly negligent, willful, and/or wanton conduct and/or failures to act caused contaminants to enter upon Plaintiffs' property and into Plaintiffs' persons.

203.   Defendants, knowingly or in circumstances under which they should have known, engaged in deliberate acts and omissions that released contaminants which were substantially certain to invade the water and properties of Plaintiffs and the putative class.

204.   Defendants knew or should have known of the likelihood that PFAS contamination would migrate into Plaintiffs' drinking water.

205.   Defendants' actions resulted in contaminants entering into Plaintiffs' persons and properties, damage to property and a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

206.    Defendants' actions were done with actual malice or wanton, reckless or willful disregard for Plaintiffs' safety, rights, and/or property.

207.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

208.    As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered property damages, consequential damages, exemplary damages, and have been placed at a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

### Count IV- UNJUST ENRICHMENT

**All Plaintiffs and the Putative Class Against Both Defendants**

209.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

210.    Defendants have received the benefits of disposing of PFAS without incurring the costs associated with conducting such disposal in a safer and more appropriate manner.

211.    The retention of these benefits constitutes unjust enrichment in the amount of all amounts not expended by failing to provide for the disposal of the PFAS materials in a safer and more appropriate manner.

212.    It would be unjust to allow Defendants to retain the benefit they obtained from Plaintiffs.

213.    Plaintiffs are entitled to exemplary damages.

### Count V –NEGLIGENCE

**All Plaintiffs and the Putative Class Against Both Defendants**

214.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

215.    Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care in creating, selling, applying, and disposing of PFAS substances, including but in no way limited to the operation of the Landfill.

216.    Section 324.20101a of the Natural Resources and Environmental Protection Act imposes duties on Defendants, including the duties to "exercise due care by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances, mitigate fire and explosion hazards due to hazardous substances, and allow for the intended use of the facility in a manner that protects the public health and safety" and to "[t]ake reasonable precautions against the reasonably foreseeable acts or omissions of a third party and the consequences that foreseeably could result from those acts or omissions."

217.    Plaintiffs and the putative class relied on the Defendants to perform their duties.

218.    Defendants failed to exercise reasonable or due care.

219.    Defendants breached their duties to Plaintiffs in ways including but not limited to the following:

a.  Failing to exercise ordinary care in the manufacture of PFAS and PFAS-containing products;

b.  Failure to warn of known harms of PFAS;

c.  Failure to exercise due care by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances;

d.  Failure to exercise due care in the disposal of PFAS, including the construction, operation, maintenance, use, and closure of the Landfill;

e. Failure to take reasonable precautions against the reasonably foreseeable acts or omissions of a third party and the consequences that foreseeably could result from those acts or omissions; and

f. Failure to warn Plaintiffs and the Class about the likelihood that their water supply was or would become contaminated.

220. Plaintiffs and the putative class suffered harm resulting from Defendants' failures to exercise reasonable care.

221. Defendants are liable to Plaintiffs and the putative class for all harms resulting to themselves and their property from Defendants' failures to exercise reasonable care.

222. Defendants' liability includes without limitation increased risk of disease, disorder, and illness, and property damage suffered by Plaintiffs and the putative class as a result of Defendants' failures to exercise reasonable care.

223. Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

224. As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered property damages, consequential damages, exemplary damages, and have been placed at a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

## COUNT VI – GROSS NEGLIGENCE

### All Plaintiffs and the Putative Class Against Both Defendants

225. Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

226. Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care in creating, selling, applying, and disposing of PFAS substances, including but in no way limited to the operation of the Landfill.

227. Section 324.20101a of the Natural Resources and Environmental Protection Act imposes duties on Defendants, including the duties to "exercise due care by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances, mitigate fire and explosion hazards due to hazardous substances, and allow for the intended use of the facility in a manner that protects the public health and safety" and to "[t]ake reasonable precautions against the reasonably foreseeable acts or omissions of a third party and the consequences that foreseeably could result from those acts or omissions."

228. Plaintiffs and the putative class relied on the Defendants to perform their duties.

229. Defendants failed to exercise reasonable or due care.

230. Defendants breached their duties to Plaintiffs in ways including but not limited to the following:

a. Failing to exercise ordinary care in the manufacture of PFAS and PFAS-containing products;

b. Failure to warn of known harms of PFAS;

c. Failure to exercise due care by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances;

d. Failure to exercise due care in the disposal of PFAS, including the construction, operation, maintenance, use, and closure of the Landfill;

e. Failure to take reasonable precautions against the reasonably foreseeable acts or omissions of a third party and the consequences that foreseeably could result from those acts or omissions; and

f. Failure to warn Plaintiffs and the Class about the likelihood that their water supply was or would become contaminated.

231. Plaintiffs and the putative class suffered harm resulting from Defendants' failures to exercise reasonable care, which were so reckless as to demonstrate a substantial lack of concern for whether an injury would result;

232. Defendants are liable to Plaintiffs and the putative class for all harms resulting to themselves and their property from Defendants' failures to exercise reasonable care.

233. Defendants' liability includes without limitation increased risk of disease, disorder, and illness, and property damage suffered by Plaintiffs and the putative class as a result of Defendants' failures to exercise reasonable care.

234. Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

235. As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered property damages, consequential damages, exemplary damages, and have been placed at a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

## COUNT VII- PRODUCT LIABILITY- DEFECTIVE DESIGN

### All Plaintiffs and the Putative Class Against Both Defendants

236. Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

237.    At all times relevant hereto, Defendants were in the business of designing, developing, engineering, manufacturing, researching, testing, providing, and/or distributing products containing PFAS.

238.    Defendants had a duty to design their products in a way that would prevent human exposure to toxic chemicals and the contamination of the natural environment.

239.    Defendants breached their duty by, among other acts, negligently and wrongly designing, developing, engineering, manufacturing, researching, testing, providing, and/or distributing PFAS products and therefore failing to exercise reasonable care to prevent these products from posing an unreasonable risk of harm to human health and the environment.

240.    It was reasonably foreseeable that the PFAS chemicals made, sold, and/or utilized by Defendants would contaminate the environment, including water supplies.

241.    It was reasonably foreseeable that the PFAS chemicals made, sold, and/or utilized by Defendants would enter the bodies of Plaintiffs and the Class Members by environmental contamination, including of their drinking water.

242.    Upon information and belief, alternative designs of Defendants' products were and are available, reasonable, technologically feasible and practical, which would have significantly reduced or prevented the harms suffered by Plaintiffs and the Class

243.    Defendants' products were defective at the time of manufacture as well as at the time that they left the Defendants' control.

244.    As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered property damages, consequential damages, exemplary damages, and have been placed at a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

## COUNT VIII- PRODUCT LIABILITY- FAILURE TO WARN

### All Plaintiffs and the Putative Class Against Both Defendants

245.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

246.    At all times relevant hereto, Defendants were in the business of designing, developing, engineering, manufacturing, researching, testing, providing, and/or distributing products containing PFAS.

247.    Defendants had a duty to provide reasonable instructions and adequate warnings about the risk of injury and hazardous nature of the products, as well as their harmful effects to human health and the environment.

248.    Defendants knew or should have known that the distribution, storage, and use of these products would likely contaminate the environment and enter the water supply, harming human health, property, and the environment.

249.    These risks were not obvious to end users.

250.    Defendants breached their duties by failing to provide warnings, or at least adequate warnings, that use of the products could result in PFAS chemicals entering the human body and posing a substantial risk to human health.

251.    Defendants breached their duties by failing to provide warnings, or at least adequate warnings, that use of the products could result in contamination of the environment and drinking water.

252.    Sufficient and adequate instructions or warnings would have greatly reduced or avoided the harms suffered by Plaintiffs and the Class Members as set forth in this Complaint.

253.    As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered property damages, consequential damages,

exemplary damages, and have been placed at a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

## COUNT IV- BATTERY

### All Plaintiffs and the Putative Class Against Both Defendants

254.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

255.    Defendants willfully, wantonly and recklessly, generated, disposed, discharged, and allowed the release and migration of toxic chemicals into the environment which caused a direct, harmful and/or offensive contact with Plaintiffs and the Class and thereby committed battery upon Plaintiffs and the Class.

256.    The wrongful touching and/or contact occurred when PFAS invaded the bodies of the Plaintiffs and Class Members through their drinking water.

257.    Defendants put in motion the chemicals that touched Plaintiffs and Class Members.

258.    Defendants acted willfully and wantonly with reckless disregard that their failure to act to stop the release of PFAS into the environment would wrongfully cause the touching of Plaintiffs and the Class.

259.    Defendants' acts and omissions showed a willful, wanton, and reckless disregard of persons, including the Plaintiffs and the Classs, who foreseeably might be harmed by such acts or omissions.

260.    The battery of Plaintiffs and the Class was offensive, unwelcome, and done without the consent of Plaintiffs and the Class.

261.    Plaintiffs and the Class were injured as a result of the battery.

262.    Plaintiffs and the Class sustained damages as a result of the battery.

263.     As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered consequential damages, exemplary damages, and have been placed at a substantially increased risk for developing numerous diseases, disorders, and illnesses, as described herein.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs request that the Court grant them:

     a.  An order certifying one or more classes pursuant to Fed. R. Civ. P. 23;

     b.  An order declaring the conduct of Defendants unconstitutional;

     c.  An order declaring the Defendants liable for each Cause of Action as stated above;

     d.  Compensatory damages, including for injuries to property as outlined herein;

     e.  Injunctive relief;

     f.  Medical monitoring;

     g.  Consequential damages;

     h.  Punitive damages as appropriate;

     i.  Any and all other damages as outlined above;

     j.  Reasonable attorneys' fees and litigation expenses; and

     k.  Such other relief as this Court may deem fair and equitable, including but not limited to injunctive relief.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

Dated: November 1, 2018

**LIDDLE & DUBIN, P.C.**
by: /s/ Nicholas A. Coulson
Steven D. Liddle (P45110)
Nicholas A. Coulson (P78001)
975 E. Jefferson Avenue
Detroit, Michigan  48207
(313) 392-0025
sliddle@ldclassaction.com
ncoulson@ldclassaction.com